Commonwealth *v*. Deni, Appellant.

290

Argued November 26, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Brad Brodsky,* for appellant.

*Vincent A. Carroll,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE KEPHART, January 7, 1935:

The Braidwood Club, not in any sense a social organization, but a resort for disreputable people, had been under surveillance by the police department of Philadelphia because of the many criminal occurrences that had taken place there, and also because a number of notorious characters known to police visited the place constantly. The proprietor was George Marsh, who prior to the occurrence which gave rise to this trial had shot two men. He had been questioned in three or four murder cases and until recently was a fugitive from justice, his apprehension being required by the United States Government as the result of a holdup of a post office at Conshohocken. The bartender of the club was John Handle. Among those who frequented the club was William Deni, gener-

ally known as Melyooch, who had been released from the penitentiary December 27, 1933, after serving a five-year sentence; he admitted he was a gangster and claimed to have been shot a dozen or more times by members of a gang seeking his life.

Acting under the orders of the superintendent of police, through the captain of the district, Harry Donahue and Joseph Ford, policemen, were detailed to keep the place under observation. On Sunday night, about 9:30, February 18, 1934, dressed in plain clothes, they went to the club, parking their car in the street seventy-five feet west of the club. Here they could observe persons entering and leaving the building. They had been there only a few minutes when Deni or Melyooch came out, walked west on Brandywine Street to 20th Street, returned in a few minutes and reëntered the club. In this walk he passed the officers' car and both policemen had an opportunity to observe him. Two or three minutes later Deni again came out of the club, and walked west on Brandywine Street, approaching the car; as he did so Officer Donahue, after speaking to his companion Officer Ford, got out of the car, crossed the front of it, and stepped to the curb in a position to speak to Deni as he passed by. Donahue approached Deni with his official badge in his hand (the place being light enough for it to be seen), and said, "We are police officers." Donahue carried no gun, jack, club, or any other weapon in his hand. Immediately and without warning or gesture of any kind, Deni pulled a gun from his pocket and fired three shots at Officer Donahue and then ran west on Brandywine Street. Two of the bullets struck Donahue and caused his death about fourteen hours later. Donahue identified Deni as his assailant before he died, and made a dying declaration to the same effect.

Deni was captured, within three-quarters of an hour after the shooting, in company with Marsh and Handle. He admitted that he shot Donahue and at the bedside of the dying officer he asked the latter "to give him a break."

He told the officers where he had thrown his gun after the shooting, and they found it where he had thrown it. Nine days later he was convicted of murder in the first degree, with sentence of death.

Defendant was brought to trial eight days after the homicide, and upon that ground urges that the court below erred in not continuing his case. The same counsel that acted for the defendant at the trial acted during this period. He retired a short time before the day set for trial, but that was merely to be appointed as counsel at the expense of the county. At the magistrate's hearing he was told that the case would be called at the first trial week which would be five or six days thereafter. When, at the opening of the trial, he made his motion for a continuance and it was overruled, he took no exception to the action of the court, but, notwithstanding this, if the interests of justice demanded more time, we would overlook that fact.

In determining whether a continuance should be granted in any criminal case, the nature of the crime and the circumstances attending it must be considered. The occurrences surrounding a crime, its preparation and execution, may be so involved that more time is required to prepare a defense than where such complicating incidents are not involved. In the latter case a speedy trial could and should be had. In all cases such time should be given for preparation that a charge of undue haste can not be fairly made. The circumstances attending the commission of this crime were not in any way intricate or involved; the ninth day after its commission was not, therefore, an unreasonably short time in which to proceed with the trial, the defendant having been given ample notice that this would be done, and to prepare his case. Defendant was provided every opportunity to produce witnesses, and was permitted to use the processes of the court for that purpose, but he mentioned no witness that he was unable to get, nor does he make such complaint here. He proposed to show he was

a victim of gangsters and was liable to be killed at any time; he testified to that fact and to the number of times he had been shot, and would show his body to prove it. He had one witness to corroborate his statements, and the testimony of another witness, had such been called, would only have been cumulative. An application for a continuance is addressed to the sound discretion of the trial court, whose action will not be disturbed unless that discretion has been abused; where, as here, the ground upon which the continuance is asked is the absence of witnesses whose testimony, if produced, would be merely cumulative, the refusal of the continuance is not an abuse of discretion: Com. v. Pennington, 249 Pa. 536; Com. v. Blakeley, 274 Pa. 100. If defendant suspected the two officers of being gangsters and for that reason shot Donahue, the jury had ample testimony before it to show that fact; they obviously did not believe his story. Defendant complains that a continuance should have been granted and a new trial awarded because of newspaper publicity unfavorable to him. This reason was not given to the trial judge when a continuance was asked; it was advanced after the trial. In such matters, the court below is in a better position to determine whether the case should be postponed or a new trial granted, and the propriety of its action cannot, therefore, be questioned. Moreover, in the instant case, we think the discretion of the court below was wisely exercised, for it does not appear that the newspaper articles complained of had any tendency to prejudice the defendant.

Appellant further objects to certain incidents at the trial, referring to what he terms "unfair observations of the court and district attorney." Specifically he charges that the prosecuting officer used undue familiarity in addressing one of the defense witnesses as "Georgie," the result of which was to create merriment in the court room. It is needless to say that a trial judge should suppress any effort of this kind to belittle a defendant's witness in a homicide case so as to provoke mirth and ridi-

cule. But, the record entirely fails to show the merriment appellant complains of. The man addressed as "Georgie" was generally called by that name, and the record does not disclose nor is there a supporting affidavit that "there was a demonstration" in the court room. Of course, in the trial of cases, occasional situations arise which cause laughter. This may come from the demeanor of a witness, the questions asked or the answers given. Such incidents are sometimes unavoidable, but there is nothing here to show that defendant was prejudiced in the slightest by any questions asked or answered as it relates to the matter under discussion.

Defendant also complains of remarks made by the assistant district attorney to the jury. In his closing address the Commonwealth's officer called some of the jurors by name. Apparently the practice or custom of addressing jurors by name has been established in certain counties. The practice we unhesitatingly condemn, but indulgence in it does not constitute reversible error. The trial judge should, to take away any possible inference of personal acquaintance and influence, have counsel address their remarks to the jury as a body. Had this conduct been of such importance at the time and so serious as to warrant the granting of a new trial, defendant's counsel should have at once called the court's attention to it and asked for the withdrawal of a juror: Com. v. Shoemaker, 240 Pa. 255; Com. v. Sushinskie, 242 Pa. 406. But we have said that it does not constitute reversible error, nor did any of the other remarks of the district attorney which the defendant complains of. It is not certain just what the assistant district attorney did say, but, if defendant's summary of his language be correct, it was a fair argument to make.

Defendant further contends that the court erred in declining to charge that there was no burden on the defendant to keep the homicide at second degree murder. There was no burden on the appellant at any time. He did not attempt to establish any affirmative defense, and the criti-

cism that the jury did not know what the word "burden" meant, was uncalled for. The charge with regard to the burden resting on the Commonwealth throughout was distinct and explicit, and the court instructed them fully that to establish a felonious killing, the burden was on the Commonwealth to prove beyond a reasonable doubt every element of that crime, as well as to raise the killing to murder of the first degree. The trial judge did not emphasize the Commonwealth's evidence more than that of the defense. The evidence of the Commonwealth was more voluminous and required longer time to discuss. The defendant was found guilty of an atrocious crime, and the jury was amply warranted from the evidence in so finding. Defendant took upon himself the consequences of his act, and we see no reason why we should disturb the judgment and sentence entered below.

The judgment is affirmed, and the record is remitted to the court below for the purpose of execution.